## Stutiville's Executors, et al. v. Wheeler, et al.

(Decided March 9, 1920.)

## Appeal from Grayson Circuit Court.

1. Wills—Undue Influence.—Undue influence, such as will invalidate a will, is such influence as substitutes the will of another for that of the testator in the devise and disposition of his estate.

2. Wills—Undue Influence—Burden of Proof.—Where it is admitted that the beneficiaries named in a will were absolutely innocent of any purpose or effort to influence the testator to devise his property to them, the burden is upon the contestants to show by clear and convincing evidence that the testator was induced by outside influence to dispose of his property to the prejudice of contestants.

3. Wills—Undue Influence—Anonymous Letters—Evidence.—Where the evidence merely shows that the testator received anonymous letters threatening to start a prosecution against him and to otherwise harm him, which he believed were written or instigated by his daughter whom he disinherited, there is not sufficient evidence upon which to set aside an otherwise valid will on the ground of undue influence exerted over the testator.

4. Wills—Evidence—Testamentary Capacity.—Evidence in this case examined and held insufficient to show either testamentary incapacity or the exercise of undue influence over the testator in the disposition of his property.

J. M. CAMPBELL and H. L. JAMES for appellants.

BEN WASHER, M. M. LOGAN, ROSCOE VINCENT and B. SCHULMAN for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing.

This appeal is from a judgment entered on a verdict finding a paper, dated January 8, 1917, not to be the last will and testament of Oscar P. Stutiville. He was a resident of Grayson county and died there in January, 1918. Although he was a single man at the time of his death, he had been married either two or three times. On January 8, 1917, he signed and properly executed the will in contest, which reads as follows:

"To all whom it may concern:

"Know all men by these presents that I, Oscar P. Stutiville of the county of Grayson, state of Kentucky, and being in my right mind do make this my last will and testament.

"1.    I give and bequeath to my daughter, Lula B. Wheeler, one dollar.

"2.    I give to O. R. Stutiville's 2 children, Francis and Ada, one-half of the remainder of my estate real and personally.

"3.    I give one-half of my estate real and personal to Omar Jeffries at my decease.

"4.    I hereby appoint E. T. Campbell my executor without bond to carry out the foregoing.

"Jan. 8th, 1917.

"O. P. STUTIVILLE.

"Witness:

"Buel Craddock.

"J. F. Craddock."

The will was probated by the Grayson county court at its February term, 1918, and in July following Lula B. Wheeler, daughter of the testator, instituted this contest of the will by filing in the circuit court of that county a petition charging, (1) that the testator did not have mental capacity sufficient to make a will; (2) that the will was the result of undue influence exercised over the testator by the beneficiaries and those interested with them.

The trial had not progressed far until counsel for the contestants announced that contestants would no longer insist that the testator, Stutiville, did not possess mental capacity sufficient to make a valid will, but "that contestants did not admit that he knew the natural objects of his bounty." All the witnesses who had testified up to that time stated that Stutiville was a man of strong mind, quite capable of making a will   After that, no further inquiry was made concerning the mental condition of testator except to show that he did not have the natural objects of his bounty in mind at the time he made the will and that he was unduly influenced to give his property to the beneficiaries named in the paper. On this question alone was the case submitted to the jury which found and returned a verdict against the will.

It is not contended by contestants that either of the beneficiaries named in the will exercised undue influence on the testator or induced him to dispose of his property as he did by the will, but contestants do insist that other persons, some of them members of the family, did designedly and for the purpose of influencing the testa-

tor in the disposition of his property, write anonymous letters and tell damaging stories calculated to, and which did in fact prejudice the testator against his daughter, Lula B. Wheeler and her child, and thereby accomplished their purpose of having Lula B. Wheeler disinherited. Quite a lot of evidence is introduced to sustain this contention and we will quote from the testimony such as in any measureable degree tends to support this contention of appellee.

The first witness called was A. L. Nickell, county court clerk of Grayson county, who produced the records showing the probate of the will, but gave no evidence concerning the exercise of undue influence.

The next one called was Buell Craddock, who was one of the attesting witnesses to the will. By him the due execution of the will was proven. He was then asked:

"Q. Is it not a fact that your father suggested to him (Stutiville) to leave Lula Wheeler out? A. Possibly so, I couldn't say. Q. Is it not a fact that your father and Mr. Stutiville were trying to devise a plan so that he could leave Lula Wheeler entirely out? (Objection overruled.) By the court: He can answer if he knows. A. Well, I think that would be like it. . . . Q. Did they say anything while Mr. Stutiville was at your father's and your father was writing the will, about so writing it as Lula Wheeler would get nothing out of the estate? A. I think possibly they did—I think so."

From a further examination of the testimony of this witness we learn that Stutiville dictated every word and line of the will. In the language of the witness Stutiville "worded the will" and Robt. Craddock, father of the witness, who wrôte the will, acted only an amanuensis, writing down only what the testator Stutiville dictated. While it appears that there was talk between the testator and Charles Craddock with reference to leaving Lula B. Wheeler out of the will, it is manifest from the evidence of this witness that the testator was the one who sought to leave her out and was inquiring of Mr. Craddock how best to word or phrase the will as to do so. Mr. Craddock was of opinion that the testator must leave to her (his daughter) at least one dollar in order to make the testamentary paper good, and therefore suggested that her name be mentioned in the will and she be bequeathed one dollar, which suggestion was accepted

by the testator because it was his desire and purpose to disinherit his daughter for reasons known to him.

J. F. Craddock was next called by the propounders to prove the execution of the will. He stated that he was present at the making of the will and that at the instance of the testator had witnessed it; that his father, Robt. Craddock, wrote the paper according to the direction of the testator Stutiville. At this point the propounders rested, and the contestants called Lula B. Wheeler as a witness. She is the daughter of testator and the only child unless Shelby Stutiville, who lived in Tennessee and who had never seen testator, was a son.

Lula B. Wheeler was about forty years old at the time she testified, and stated that when her mother left her father, several years ago, she was a little child and went with her mother; that while they lived at no great distance from her father, she did not visit him and seldom, if ever, saw him until the last few years of his life; that she had been married twice and divorced twice; that she had one child, a daughter, about thirteen years of age; that her mother was dead and that she had lived chiefly with her mother's people; that two or three years before the death of testator he came to see her and invited her to come and live with him, and told her that as she was living alone with her little girl, and as he needed a housekeeper, he would be glad for her to come and live with him, which she consented to do. This was in 1911. At that time the testator, a widower, kept a housekeeper, Josie McCrady, and there was some talk in the neighborhood concerning the relations that existed between the testator and Mrs. McCrady. After living with her father only a few months and after he had sent Mrs. McCrady away, the daughter, Mrs. Wheeler, disagreeing with her father, suddenly left his home and went away, giving as her reason that her father had not given up the McCrady woman, and that she would not live there with the McCrady woman. At any rate, she did not live at his house but little after that but continued to reside in the same neighborhood most of the time. However, occasionally she went away, and admitted that on some of these trips she had a male companion. On one occasion she and a married man living in that neighborhood went into one of the northwestern states and lived until he was arrested and brought back, and she shortly thereafter returned to Kentucky. While she re-

mained at her father's house she admits she wrote a letter or letters to the justice of the peace nearby, insisting that he start a prosecution against Mrs. McCrady, or against her father, or both, on a charge of adultery. Along about the same time the testator received one or more anonymous letters of a threatening nature, indicating that he was going to be prosecuted on account of his illicit relations with Mrs· McCrady. He charged his daughter with writing these letters and told her he would likely disinherit her. She, however, denied to him that she wrote the letters but this did not change his mind upon the subject. Whether she did write the letters is. not made clear by the evidence. She only says she told him she did not write the letters.

This witness gave no testimony tending to show that her father's mind was unsound or that he was or could have been unduly influenced against her except that his mind may have been poisoned against her by designing persons who desired to see her disinherited but who did not expect to receive any of the estate themselves.

Virgil Amos Butler testified that he lived on the lands of Stutiville in 1911 or 1912, and that he frequently saw and talked with him. He was asked:

"Q. Did you hear him say anything about his daughter Lula? A. On one occasion he was talking and he said he was going over to Canmer and bring her over there to live; that he thought they could get along; that there was a woman there and he wanted to bring his daughter back there and get rid of that woman. Q. When was that? A. Along in the fall of 1911."

This conversation occurred just a short time before Lula came to live with her father. Further testifying he said:

"One morning after I was up at the field fixing the fence where the river was up, when I came back down in the evening he said to me 'I want you and Lula Wheeler to keep yourselves out of my business,' or something to that amount. I thought he was just joking. He raised a right smart fuss and Lula came up and said: 'Papa, there ain't a thing betwixt me and you except that woman.' Q. Did he say who told him Lula Wheeler had been doing anything? A. No, sir; only he accused her of writing a letter and accused me of taking it to Elizabethtown and mailing it to him."

Sam Dunn deposed that he had known Mr. Stutiville
for a good many years, and in fact ever since he came to
Kentucky from Tennessee; that Stutiville had told the
witness that he was once married down in Tennessee.
He was then asked:

"Do you know how they got along (meaning testa-
tor and Lula Wheeler)? A. I reckon they got along
kindly bad, that is toward the last—that is the last year
she was living there. . . . Q. What was the cause
of it if you know? A. It was on account of the woman—
Josie McCrady stayed there with him. On account of them
not getting along. Q. Did you ever hear Mr. Stutiville
make any complaint about his daughter Lula? A. Only
in this way, that she did not treat him right."

This witness also testified that he was acquainted
with the reputation of Lula B. Wheeler for morality and
chastity in the neighborhood where she lived, and that
it was not very good. He said that sometimes he bor-
rowed money from testator and that he had sufficient
mind to transact business. In fact the witness thought
the testator had as good mind as most business men.

"Q. I will ask you what kind of mind he had. Was
he headstrong, self-willed or vacillating? A. He had
a head of his own. Q. Was he or not easily influenced to
do what he did not want to do? A. No, sir, you could
not influence him at all. . . . Q. Did you ever hear
him talk irrational indicating that he was out of his mind
at any time? A. No, sir. Q. What kind of business man
was he? A. He was a farmer. Q. How did he transact
his business, carefully or otherwise? A. Very carefully."

Charles Craddock, testified that the testator had sev-
eral months before his death received a bottle of what
appeared to be whiskey which was thought by the tes-
tator to be poisoned. In telling about what the testator
said and did on this occasion, the witness said: "He
spoke to me about some stuff that was sent that he un-
derstood by his daughter and another party to poison
him and he made some very strong threats against the
man concerned with the lady and told me he was going
to kill him and I told him, I said 'Mr. Stutiville I would
not think about such a thing as that because I don't be-
lieve that man had any more to do with that than I did,'
and I talked with him quite a little bit and he seemed to
be reconciled about it."

"Q. What did he say they had sent him? . A. He did not say what it was only some poison fixed up in some whiskey. Q. Did he say who brought it to him? A. Yes, sir, he said Proctor Stutiville brought it to him, a boy that his father raised. Q. Did he tell you what Proctor Stutiville said to him about it? A. Yes, sir. Q. What did he say? A. He said Proctor Stutiville said his daughter and Curt Wheeler had sent him some medicine. . . . Q. Did the old man seem to be offended at his daughter by reason of this? A. He seemed more offended at Wheeler."

Further testifying he said:

"He came to my place three years ago this fall somewhere between the fifteenth and twentieth of September right about night one evening and asked me to go over there and talk to his daughter about getting the trouble settled between him and her. She was going to have him prosecuted about keeping this woman there. I told him I could not do it the next day that I was busy getting some corn, that the hands were leaving and I could not leave until I got the corn cut and as soon as I got it cut I would go. I cut the next day and the second day at noon I cut the field down there and I went away that afternoon and I rode up to Mrs. Wheeler's and the little girl was at the fence and I asked her where her mother was and she said she was in the house and he was in the garden digging potatoes, and he called me to get down off the horse and go in the house.

"Q. Was it Mr. Stutiville who called you? Yes, sir; and I went in the house and talked with the lady about the trouble and made some proposals in settling the trouble and it seemed to be satisfactory with her and I went back out and started back down the road and he met me at the lower end of the garden and I told him the propositions I had made to her and he just remarked by God she had to leave, and I never said anything more. Q. Did he ever say anything about making a will and cutting off his daughter? A. I believe in the talk there he spoke something along there to that amount, I could not say just exactly what."

Curt Wheeler, testified that Stutiville had talked to him once about a wife in Tennessee and told him that he had married a woman by the name of Grace in that state but did not say what had become of her. He did not tell him whether he had a child by her or not.

Shelby Stutiville, who was made a party to this contest and who claims to be a son of the testator, is alleged to be an offspring of the marriage of Stutiville and Miss Grace in Tennessee.

Perhaps the strongest evidence introduced by contestants to show undue influence is that given by Monroe Miller. He was asked:

"Q Did Mr. Stutiville ever say anything to you about whether he was influenced by any one to make this will? A. No, sir. Q. Never said anything to you about it? A. No, sir. Q. Did you ever hear him talk about it? A. Yes, sir, he said he had made a will and willed Lula out and he said a fellow told him to make the will and then he made it on account of her misconduct. Q. Some fellow had told him to make the will but he did not make it because the fellow told him? A. No, sir, that he made it on account of her misconduct. Q. Did he tell you who the fellow was? A. Charles Sullivan for one. She took up with Charles Sullivan and he wanted to kill him. . . . Q. Did he ever say anything about her living there with him? A. He said he could not get along with her on account of a train of beaus. Q. Did he talk about some letters he had received in Hart county? A. Yes, he said he had got letters from Charles Sullivan and Lula, that they were going to kill him. Q. Did he tell you he had received letters to watch his daughter and Charles Sullivan that they were going to kill him. A. Yes, sir. . . . Q. You say he was not easily influenced. You mean he was a man not easily pursuaded to do anything? A. I don't think he was. . . . Q. He was a man of pretty high prejudice? A. No, I did not take him that way. . . . Q. If he did not like a party, is it not a fact that you would seldom hear him say anything about them at all? A. Mighty seldom, mighty seldom. Q. Did he say that that fellow suggested to him how he ought to make the will at all? A. No, sir, never said that."

Mrs. Josie McCrady gave no evidence whatever which would reflect light upon the mental condition of the testator, or upon the charge of undue influence made by the contestants.

Joe Snyder, in speaking of the poisoned whiskey brought to the testator by Proctor Stutiville, said: "I don't know that anything took place only he (Proctor Stutiville) brought it in there and said to him (testator)

'here is something they fixed to kill you with;' he (testator) said 'Who?' and he (Proctor Stutiville) said 'Lula Wheeler, your girl, and Curt Wheeler.' That was about all only Oscar asked was he sure that they fixed it to give to him, and he said yes.

". . . Q. Was he a man you would consider easily influenced? A. No, sir, he was not. Q. Did he talk much about his private business affairs, or was he a man who seldom mentioned them? A. He didn't say but little about them; I don't think he did to anybody. . . . Q. Was he a man who seemed to have a clear mind and sound judgment? A. I think he was. If he was not I was fooled in him."

This was one of the witnesses for contestant.

Shelby Stutiville, the alleged son of testator; Francis Stutiville, Ada Stutiville and Mrs. Omar Jefferies, beneficiaries, and some other witnesses were called, but none of them gave any evidence as to the testator's mental capacity or his susceptibility to be influenced by others.

Robert Craddock, the man who drew the will, testified for the propounders. He stated that before he drew the will the testator outlined what he wanted to do with his property, and this outline was followed word for word by the draftsman; that before he drew the last will and after testator had come to the home of Robert Craddock for the purpose of having the will prepared, he (Craddock) plucked testator off to a private place and said to him that he had heard a rumor in the neighborhood to the effect that testator had a living son in Tennessee, to which testator stated in substance, raising his hands, "It is all false." Some four or five other witnesses were called for the propounders who testified that they had lived in the same community with Lula B. Wheeler, contestant, and they were acquainted with her general reputation for morality and virtue, and that it was bad.

We have tried earnestly to give the substance, and in most instances the exact words of all witnesses testifying in the case on the mental condition of testator, and his susceptibility to outside influences, and in fact, all circumstances or statements that indicated that the testator's mind was not sufficient to make a rational survey of his estate, know the objects of his bounty and dispose of his property according to a fixed purpose of his own.

Contestants insist that testator's mind was poisoned and filled with prejudice against his daughter, Lula, by persons other than the beneficiaries of the will for the purpose of causing him to disinherit his daughter, and in support of this insistence they point to the fact that he received anonymous letters which threatened him with prosecutions and with death, which he believed were written or caused to be written and sent by his daughter; and further that he was falsely told by the bearer of the poisoned whiskey which he received, that it was sent by his daughter Lula and another person for the purpose of arousing his prejudice against his daughter, and that this did arouse his prejudice and resentment and caused him to give the bulk of his estate to his collateral kindred, and to give but one dollar to his only child. Every witness testifying that speaks upon the subject states that Stutiville's mind was strong and that he was not easily influenced. There is not a single exception to this. All evidence is one way upon this point. As a sensible man acquainted with affairs in his family and community, he must have known more about his daughter than most other people, and also he must have known that she was trying to have him prosecuted on a criminal charge. According to the testimony of some witnesses he spoke frequently of Lula's threat to prosecute him and to give him trouble. No doubt, he was acquainted with the handwriting of his daughter. While she denied to him that she wrote the anonymous letter which threatened him with prosecution she admits that she did write the justice of the peace one or more letters in an attempt to instigate a prosecution. When we consider these facts along with the further fact that testator was divorced from the mother of Lula and that Lula went with her mother and continued to live with her and her mother's people until she was nearly forty years of age, without visiting or showing any filial love for her father, and had since he invited her to come to his house made trouble for him, and finally in a fit of anger left his home and led a dissolute life it is not so strange that the father did disinherit the daughter.

Undue influence, as applied in the law of wills, is such an influence as obtains dominion over the mind of the testator to the extent of destroying free agency on his part in the disposition of his estate and constrains him to do that which he would not otherwise have done if left

to the free exercise of his own judgment, and it is said by law writers that it is not material when this influence was exerted if it was present and operating on the mind of the decedent at the time the paper was executed.

We have written in similar will contest cases that undue influence can only be established by evidence showing that such influence was exercised, and it is not sufficient for the contestant to show that there was opportunity to exercise undue influence or that there was a possibility that it was exercised.

Undue influence is that kind that overpowers and subjugates the mind of the testator in such way as to destroy his free agency and make him express the will of another rather than his own. Not every influence exerted over a testator is undue, but only such influence as constrains the testator to do that which he would not otherwise do, is undue influence.

An influence which is obtained by modest persuasion and argument addressed to the understanding, or by mere appeals to the affection, cannot be properly termed undue influence in a legal sense. Wise v. Foote, 21 Ky. 15.

Contestants did not claim that the beneficiaries in the will had anything whatever to do with influencing the testator to give them his property. But they say that other persons possessed of bad motives influenced the mind of the testator in such way as that they compelled him to withhold his property from his daughter and to give it to his nieces. It is not an affirmative, positive influence which contestants say was exerted over testator to influence him to give his property to his nieces, but it was a negative or repellant influence which was put forth by third persons to prevent the testator from giving his property to his child. The threats relied upon did not induce the testator to give his property in a way to protect himself but only to give it to those members of his family in whom he had confidence and of whom he was not afraid. In Broaddus v. Broaddus, 10 Bush 310, we held that undue influence must be such as amounted to coercion or force, or such as destroyed the power of testator to act in accordance with his own purposes in the disposition of his property. In Lucas v. Cannon, 13 Bush, 650, we said: ''Undue influence must be an influence obtained by flattery, excessive importunity, threats or

some other mode by which dominion is acquired over testator's will, destroying his free agency.'' If undue influence must eminate from flattery, excessive importunity or threats, there was no undue influence in the case at bar because there was no flattery, excessive importunity or threats which induced the testator to give his property to those named in the will, unless we say that the threats of Lula, his daughter, to have her father prosecuted for adulterous relation with Mrs. McCrady was such a threat, and this seems impossible because it does not come within any rule known to us with respect to the invalidation of wills on account of undue influence. Those threats made by the daughter were not intended to prevent the father from giving her his property or to induce him to give it to his nieces. If, however, she made such threats and they came to the ear of her father, it no doubt offended him and caused him to form a fixed purpose not to give to so unfilial an offspring any part of the results of his labor. Of course, every bequest and devise in a will is brought about by some influence operating upon the mind of the testator; and if the father in this case was of sound mind and of testamentary capacity, the mere fact that his daughter by her misdeeds or bad conduct had lost the love and respect of her father and he was thus influenced to disinherit her and to give the bulk of his estate to others, yet there is no evidence of such undue influence as is regarded by the law. Undue influence that will vitiate a will must emanate from the beneficiaries or those interested in them and be intended to and actually induce the testator to make a disposition of his property to the advantage of those wielding the undue influence; but where the beneficiaries are absolutely innocent of any purpose or act calculated to unduly influence the testator to make a bequest to them, and no person interested in the beneficiaries attempted to induce the testator, either directly or indirectly to give his property to such beneficiaries, but he does so because of the misconduct or disobedience of his daughter to whom he otherwise would have given his property, there is no semblance of that character of undue influence which would invalidate a will.

Aside from this we apprehend that the daughter did not bring herself in close relation with the father nor attempt to endear herself to him. On the contrary she made herself offensive. As there was a divorce proceed-

ing between the mother of the daughter and the father, there was more or less bad feeling. The daughter went with her mother and remained with her and away from the father until she was almost forty years of age, giving her father no attention whatever. Finally her father invited her to come to his house to live, but no sooner did she move in with him then she began to make trouble and she and her father had many disputes. Matters became so bad that in about four or five months she moved away, but continued to annoy him more or less. She had threatened to have him prosecuted and, according to the common rumor of the country, she had sent him poisoned whiskey. Never having cherished a great love for her, the father was not, as we may naturally suppose, drawn near to her by reason of her moving into his house. If he had loved her before, her quarrelsome and bombastic disposition toward him while at his house would likely have destroyed it.

Nor can it be said that Stutiville did not know the objects of his bounty nor his duty to them. He did know the objects of his bounty, and he was well acquainted with his daughter and with his nieces and other members of his family. He considered the matter of making a will for many months. In fact, he made two wills in substance the same. That he knew the objects of his bounty cannot be gainsaid, because he mentioned them all in his will, and that he knew his duty to them is made manifest by the careful consideration he gave to the whole matter and the evident purpose he originally entertained of giving to his daughter his property. When, however, he became associated with her and learned of her real disposition, and she moved away and left him at a time when he needed her; attempted to institute prosecutions against him causing him to say to her that he would likely disinherit her, it is not strange that knowing the object of his bounty and his duty to them, he did not give but little of his estate to his daughter

Having carefully considered all of the evidence adduced by contestants, we are firmly of opinion that there was a total failure to show either mental incapacity on the part of the testator, or undue influence exerted over him; nor is there evidence to incline the court to the belief that the testator did not know the objects of his bounty or his duty to them. The court should have preemptorily instructed the jury to find and return a ver-

dict for the propounders of the will, and if on another trial the evidence is in substance the same as upon the last trial, the court will so instruct the jury.

Judgment reversed.