## Smith et al. v. Smith et al.

(Decided March 25, 1932.)

GILBERT, PICKETT & MATTHEWS for appellants.

TODD & BEARD for appellees.

Opinion of the Court by Judge Clay—Affirming.

John L. Smith, a resident of Shelby county, died in the month of September, 1928, survived by two nephews, Orville Mobley Smith and Jacob Wesley Smith, an incompetent, and by a double second cousin, Douglas Smith. By his will dated August 23, 1927, he devised and bequeathed to his nephews $1 each, and the remainder of his estate to his cousin, Douglas Smith, and appointed him executor of the estate. After its probate, the will was contested by his nephews on the ground of mental incapacity and undue influence. At the first trial the jury found against the will by a nine to three verdict. After asking a new trial on several grounds, additional grounds were filed, supported by numerous affidavits. A new trial was granted and the judgment set aside. At a subsequent trial the contestants refused to introduce any evidence, and the court directed the jury to find for the will. Contestants then made a motion to set aside the verdict and judgment and substitute therefor the verdict and judgment rendered on the former trial. The motion was overruled, and contestants appeal.

In the year 1926, the testator and his three sisters lived on a farm jointly owned by them and Orville Mobley Smith and Jacob Wesley Smith. During that year the sisters died, and their interest in the farm passed to testator and his two nephews. Thereupon the testator went to Mr. Elliott Beard of Shelbyville and had him prepare a suit for a sale of the land and a division of the proceeds. At the time, and for several years, Orville

Smith had lived in Indiana, and was the committee of his brother, Jacob Wesley Smith. On the day the land was ordered sold, Orville appeared at the sale with his father-in-law, who, on behalf of Orville, was a contending bidder against the testator. After the bidding reached a certain price, the bid of the father-in-law was accepted. However, he and Orville failed to execute bond, and a resale was ordered. At this sale the testator became the purchaser at a price considerably less than that bid at the former sale. The evidence does not disclose that the testator ever came in contact with his nephew Jacob Wesley, and it is further apparent that, although Orville and his daughter visited the testator at rare intervals, there was no particular intimacy between them and the testator. On the contrary there is evidence to the effect that, when they did visit the testator, their attitude in his home was not altogether pleasing to him, and that because of this and Orville's conduct at the sale the testator repeatedly declared that he did not want Orville to have his property. It is likewise true that there had been no particular intimacy between the testator and Douglas prior to the illness of the testator's sisters, but during their illness Douglas was sent for and from that time on he and the testator were on more or less friendly terms. It further appears that after the execution of the will the testator went with Douglas and others to examine several farms with the view of purchasing one for Douglas. It is also admitted that about three days before his death the testator called Douglas in his room and told him to lock the door and prepare three checks, two for $6,000 each, and one for $700. After their preparation, the testator signed the checks. On receiving the checks, Douglas consulted Mr. Elliott Beard, who advised him to deposit them to his credit. It was some time after the will was made before the testator went to live with Douglas, but he was living with Douglas at the time the checks were made.

Though it is the rule in this state that the trial judge has a broad discretion in granting a new trial, and we are reluctant to interfere with his action unless he abuse that discretion, it is also the rule that the granting of a new trial is error if the ground on which he acted was not sufficient and the other grounds relied on were not such as to authorize his action. Perkins v. Ogilvie, 148 Ky. 309, 146 S. W. 735; Ross v. Kohler, 163 Ky. 583, 174 S. W. 36, L. R. A. 1915D, 621; Strode v. Strode, 194 Ky.

665, 240 S. W. 368, 27 A. L. R. 313. With these principles in mind we shall consider the evidence.

The facts relied on to show mental incapacity are these: The testator formerly went to church, but did not attend the last twenty years of his life. During the last few years the neighbors did not visit him. He allowed dogs and cats in his room, and sometimes dogs slept on his bed. Though Mrs. Brewer, who lived at his home, protested and he promised not to do it any more, he would let the dogs in and say that they came and begged to come in and he just had to do it. During the year 1926, when his sister lay very ill, some of the neighbors came in to clean up. The house was so filthy that it was necessary to use a shovel and hoe. When he found that they had taken up the carpet and were carrying everything out while his sister was lying on the lounge, he said it ought not to have been done. Douglas coincided in this view. At the same time he bawled out the women who were engaged in the work. Although his sisters were ill, he called a doctor only on three or four occasions. While one of his sisters was near the point of death, he sent for an undertaker, but it is not claimed that he did not believe she was dead. He would curse and apply vile epithets to his neighbors, particularly the poolers and Ku Klux. He applied the same epithets to the preachers and said that they were out after the money. In addition to this evidence, some thirteen witnesses, some of whom testified to the foregoing facts, gave it as their opinion that the testator did not have sufficient mental capacity to enable him to know the natural objects of his bounty, his obligations to them, the character and value of his estate, and to dispose of it according to a fixed purpose of his own.

The contestant Orville Smith bases his opinion on the fact that the testator was a high-tempered man, would fly into a passion, curse everybody and everything, would sit in front of the fireplace for hours, hold his hands and wring his ears, and on one occasion while he was petting a dog he turned to his wife and said, "Leona, that is a pretty feather in your hat." The reason Mrs. Moore gave for her opinion was that the testator did not have any mind or he would not have let his sisters lie there and die in filth. She admitted, however, that the testator knew who was kin to him and knew what property he had, but said that he did not know what to do with it. Sam Moore predicated his opinion on the fact that the testator

fell out with and cursed his neighbors, including the poolers and Ku Klux Klan. He admitted, however, that the testator knew his relatives and supposed he knew Orville. He also said that he had seen John Black get the best of him in a trade. John Black traded him a blind horse for a good horse, but did not tell him that the horse was blind. When the testator discovered the horse was blind, he realized that he had been beat. According to Slone Moore, testator would tell him to do a thing one way and in half an hour he would change it, and he would curse his neighbors. Testator never put on any clean clothes, and had a little sore on his ear. Testator said that he wished Rose would stay away from there, would not come back any more. That was before any of his sisters died. Mrs. Rose Bischof did not express any opinion regarding the testator's mental capacity, but testified that he thought a lot of her and was always trying to do something for her. On one occasion when she and her husband went to the testator's home she called to him, and he said, "Get on out in the road." She said, "Uncle John, don't you know me?—it is Rose." He said, "I don't care who you are," and pointed a gun at her. Professor Bischof, Mrs. Bischof's husband, also testified to the occasion when the testator drove his wife away, and based his opinion that the testator was incapable of making a will on the fact that he would repeat all the time and he would talk about different people and curse them out. He admitted, however, that he never had a business transaction or trade with the testator. He guessed the testator knew his wife and other relatives.

The reason Joshua Cook believed that the testator was incapable of making a will was that the testator met him on three occasions and was in a mad fit. The reason for the testator's anger was that witness tried to buy a passway across his farm and witness told Mr. Moore after the women died he would give $5,000 for testator's farm. The testator cursed, said he did not have any land for sale, and did not want anybody interfering in his business. According to Joe Mosehart, the testator did not attend church, would curse and call his neighbors names, and would get in a mad fit. On one occasion the testator fell out with him over a division fence. He admitted, however, that he had not had any conversation with testator for six or seven years. He was of the opinion that testator was easily influenced because of the

way he would talk, but could not call to mind any thing special. R. M. Phillips, although of the opinion that the testator did not have mind enough to make a will, admitted that the testator always knew him and his relatives and what property he had. In answer to the usual question as to the mental capacity of the testator, A. D. Cox answered, ''Well, now, I would hardly know, he fell out with me.'' He then answered, ''No, sir.'' The reason the witness gave was that the testator fell out with him about nothing. He admitted that the testator knew him well enough not to speak to him when he saw him. He did not know whether he knew his relatives or not. He guessed the testator knew where his home was. S. M. Flood's answer to the question concerning mental capacity was ''No sir, I can answer probably one way and probably another. I think he knew his estate.'' He did not think the testator could dispose of his property according to a fixed purpose of his own. Though stating that the testator was easily influenced, he admitted that he tried to get testator to change his will but did not succeed. He never saw the testator when he did not know him. The testator was a pretty hard nut to influence when he got thoroughly set.

James Thomas Brewer, who, together with his wife, lived on the farm of the testator, testified, to the testator's habit of cursing, and to the fact that he was very mad when informed that a bank in which he had a $6,000 deposit had ''broke.'' Though claiming that the testator was easily influenced he admitted that his wife knew that he was going to let the dogs into the room because she had told him not to. Mrs. Bessie Brewer stated that she did not know whether or not the testator had mind enough to make a will, that at times he seemed just like a wild man, and at times he was all right. He would get mad at any little thing, would fly all to pieces, talk about everybody in the whole country, and rave and raise sand. After his sisters died, he seemed like he was studying about something all the time. After the bank broke, he went up and down the road and raved and said he was ruined forever and would never be any more account. One of the reasons why she thought testator could be easily influenced was that he promised to build an extra room for them, but he was persuaded not to do so, saying that Douglas told him not to do it. Frank Brown, the negro who helped the women clean up the room and was told to do whatever the women wanted, testified that

after they had gotten the carpet up the old man came back and said he did not like any such damn way of doing. At the same time he told Frank he did not blame him. At that time the old lady was lying on the lounge and they had taken everything out but the carpet. Byron Flood hardly thought the testator had mind enough to make a will, and gave as a reason that a young man by the name of Bray came to the testator's house while witness was there and accused the testator of telling that he had stolen his own tobacco. The old man commenced cursing and carrying on, and the more he studied about it the worse he got, and carried on most all night. On cross-examination, witness admitted that he had sold appellant tobacco and made a splendid sale. This was in December, 1927. Testator knew all about the proposition, and appeared like he had always been until he got him worked up a little. Thomas Brewer, uncle of Jim Tom Brewer, testified that he visited the testator in August before his death, and that the testator sent word by him to Jim Tom Brewer that he was coming over there to live with him. That was two weeks before he died, and testator knew him and everybody around him. Jim Young, who acted as clerk at appellant's sale in the fall of the year 1926, testified that the testator on the morning of the sale named over certain men and told him to keep them away. The only circumstance detailed by him in support of his opinion that the testator was incapable of making a will was that the testator paid him only $4 for his services as clerk, whereas his services were worth more. He admitted, however, that he did not ask for more.

Dr. J. W. Hill, of Bagdad, testified that the testator called at his office a few months before he died and wanted him to treat his sore and cut it off. He would not do it, and gave him some medicine to dress the place, and told him to come back to-morrow. Testator went out of his office and came back and asked if that medicine was poison. He told him he did not think so. Testator said he did not know whether to take it or not. He told the testator he might as well throw it away. The way the testator acted, he believed the testator did not have any fixed purpose in his mind whether to have it cut off or not. He changed his mind twice. The tumor or cancer was about the size of your little finger and was immediately over the mastoid cells. Possibly its location had some effect on the nourishment of the brain. Then,

in answer to a hypothetical question based on the filthy condition of his home, his cursing and swearing at his neighbors, his great excitement when the bank broke, the sleeping of the dogs on his bed, his great anger at the man who had heard that he had accused him of stealing his own tobacco, his paying the clerk of the sale $3 and giving him an additional dollar the next morning, witness said he did not think testator would be capable of transacting any legal business. On cross-examination he said that he had never talked to the testator but once, and that was in the spring of 1928. He told the testator it was not advisable to take the cancer off, that it might kill him. On cross-examination he stated that he could not say anything about testator's mental condition prior to the time spoken of.

The circumstances relied on to show undue influence are these: It was not the custom of his family to make wills, and the testator departed from the family custom; he gave his property to his cousin instead of his two nephews; though displeased with the conduct of Orville, there was no reason why he should overlook his incompetent nephew; he drove Rose Bischof from his home with a gun; the testimony of Mrs. Moore and Mrs. Brewer that, when Rose and Orville would come to see the old man and bring him fruit, the old man would hesitate to eat it, and said that Douglas said they might poison him; whenever the old man would return home with Douglas, he would be incensed against Orville; the old man expressed his resentment against Orville because he had been nosing around the bank when in fact that was not the case; Douglas' ability to get the checks from his uncle in his last illness. In addition to these facts, several of the witnesses above named expressed the opinion that the old man was easily influenced.

On the other hand, the evidence for the contestees may be briefly summarized as follows: Before the making of the will, the testator was incensed at Orville because he had run the farm up on him and then refused to take it, and because of his attitude toward the food in his home; and he repeatedly stated that he did not intend for Orville or his Indiana relatives to have any of his property. On the day the will was made, the testator went to the office of Mr. Beard, unaccompanied by Douglas, and told him what he wanted done. The will was read over in his presence and was approved by him. At the time he was in full possession of his mental powers. Douglas

claims that he never discussed the will with his uncle and did not know of its provisions until after it had been made. In addition to this evidence, some forty witnesses who had known testator more or less intimately, including two physicians who had attended the testator, the officer of a bank at which he had done business, the purchaser of a farm under a contract dictated by the testator, all testified that the testator knew his property and was a good trader, and, though somewhat high-tempered, was fully capable of making a will. None of them, some of whom saw him within a few days of his death, ever detected anything wrong with his mind. They also testified to facts showing that he was not easily influenced, but was a self-willed man.

It has long been the settled rule that opinions of non-expert witnesses that the testator was of unsound mind are of no probative value unless based on facts and circumstances sufficient of themselves to show unsoundness of mind. Wigginton's Exr. v. Wigginton, 194 Ky. 385, 239 S. W. 455. The opinions of the witnesses in this case are predicated mainly on the alleged filthy condition of the testator's home, his failure to get physicians for his sisters, his nonattendance at church, his sleeping with dogs, his habit of swearing at his neighbors and others, his fits of anger at those who offended him, and his great excitement when informed that the bank in which he had a large deposit had closed up. It must not be overlooked that cleanliness in a man's home generally depends upon the women, and there is always likelihood of neglect when they are unable to perform this duty. Though it is true that while the testator's sisters lay ill he was neglectful of the house cleaning, a lack of cleanliness, either of person or of home, has never been regarded as sufficient evidence of unsound mind. Doubtless there are many to whom the presence of dogs is offensive, but it would be going far afield to say that a childless old man was incapable of making a will because he loved dogs, permitted them to enter his room and jump upon his bed, when they came to his door, and, as he expressed it, "begged to be let in." Clearly testator's nonattendance at church gave no support to the opinions expressed. If a man's religious views or church attendance were made a test of mental capacity a large proportion of our citizens would be disqualified to make a will.

While calmness is to be commended, and swearing is to be deplored, neither the occasional absence of the former, nor indulgence in the latter, has ever been regarded as evidence of weakness of mind. Cecil's Exrs. v. Anhier, 176 Ky. 198, 195 S. W. 837; Wigginton v. Wigginton's Ex's, 205 Ky. 613, 266 S. W. 245. Certainly nothing is more calculated to offend one than an unjust charge made by a neighbor, or a misunderstanding growing out of a division fence or passway over one's farm, or the effort by some one to depreciate the value of one's property, and a loud burst of anger on such an occasion is no more than should be expected from the ordinary man, to say nothing of him of a more turbulent temper. Of course composure is not to be expected of one who has just heard of the closing of a bank in which he had a large deposit, and a few expletives followed by considerable wildness would indicate nothing incompatible with a normal mind. It follows from what we have said that the opinions of the lay witnesses were of little if any probative value. Not only so, but there is no escape from the conclusion that the opinion of the physician, based on the same facts, or on the fact that the testator was undecided whether or not he would have an operation performed, and inquired whether or not medicine given him was poison, is of but little weight.

Coming to the question of undue influence, it must not be overlooked that mere opportunity for undue influence is not sufficient. It must appear that such influence was exercised. Stutiville's Exrs. v. Wheeler, 187 Ky. 361, 219 S. W. 411. It must also be remembered that influence obtained by modest persuasion and argument addressed to the understanding or mere appeals to the affection is not undue influence in a legal sense. On the contrary, the essential fact of undue influence is that it is such as to destroy the free agency of the testator, and constrain him to do that which he would not otherwise have done if left to the exercise of his own judgment. Stutiville's Exrs. v. Wheeler, supra; Clore v. Argue, 213 Ky. 664, 281 S. W. 1005. There is no evidence in this case that Douglas Smith ever argued the matter with the testator, or even appealed to his affections. The evidence is overwhelming to the effect that the testator was incensed at Orville because of the latter's conduct in his home and at the sale, and that the testator repeatedly declared that he did not intend to give Orville or his Indiana relatives anything. If it be suggested that there

was no reason for the testator to cut off his nephew, Jacob Wesley, who was an incompetent, and was not responsible for Orville's conduct, it is sufficient to say that the testator may have believed that any provision made for Jacob Wesley would naturally redound to Orville's benefit, and he was determined that Orville should not receive anything. Aside from this, mere inequality in the disposition of one's estate between his direct descendants is not of itself sufficient evidence of undue influence, Gay v. Gay, 183 Ky. 243, 209 S. W. 11, and there is every reason why the rule should apply with equal, if not greater, force to collateral relatives. While it may be true that the report that Orville had been to the banks to inquire what the testator had was a mistake, there is enough in the record to show that, notwithstanding this, the testator's mind was fully made up. Having made up his mind, it can hardly be said that, even if the evidence had shown that Orville exercised any power of persuasion over his uncle, the case is one where his uncle was constrained to do what he otherwise would not have done. Though it be true that the testator told Mrs. Bischof to get on up the road, there was further evidence that whenever she came she wanted to get something out of him, and that her attitude in his home was far from pleasing. Not only so, but the will had been made before that event occurred. The only circumstances in the record tending in the least to show undue influence are the statements of Mrs. Moore and Mrs. Brewer that the testator said that Douglas had told him not to eat the fruit that Rose and Orville brought because it might be poison, coupled with the fact that he gave Douglas the three checks shortly before he died. Douglas denies that he ever made such a statement to his uncle, and, while he tells exactly the circumstances under which he received the checks, it is apparent from other witnesses that for some time the testator had been engaged in an effort to buy Douglas a farm and that the checks were given to him for that purpose and in order to avoid a contest. Furthermore, it is shown by two of the witnesses for appellant who visited the testator shortly before his death that his mind was then clear and he knew everybody.

After a careful consideration of the record, we are constrained to the view that the overwhelming weight of the evidence is to the effect that the testator was a strong-minded self-willed man, accustomed to having his own

way, and that in cutting off his nephews in disposing of his property he did exactly what he had repeatedly declared he would do, and exercised his own judgment uninfluenced by Douglas or any one else.

It is unnecessary for us to determine whether there was sufficient evidence of either mental incapacity or undue influence, to take the case to the jury. The case is one where the trial court might have found that the verdict, whether based on mental incapacity or undue influence, was flagrantly against the evidence. That being true, the granting of the new trial was not an abuse of discretion, even though it may have been granted on another ground.

Judgment affirmed.