## Parks et al. v. Moore's Ex'r et al.

(Decided Oct. 20, 1936.)

ROSS & ROSS for appellants.

G. MURRAY SMITH and D. ANDREW SHEARARD for appellees.

OPINION OF THE COURT BY JUDGE RATLIFF—Affirming.

C. A. Moore died testate on May 1, 1929, leaving surviving him Lee Anne Moore, his widow, and three sons, Jesse L. Moore, Oris Moore, and George Moore, and a daughter, Lizzie Moore Parks. On May 6, 1929, his will was probated by an order of the Madison county court. Lizzie Moore Parks and her husband, J. E. Parks, appellants herein, unsuccessfully resisted the probation of the will in the county court and appealed to the Madison circuit court, where a trial was had before a jury and at the close of the evidence for the opponents of the will the court peremptorily instructed the jury to find the paper in question to be the last will and testament of C. A. Moore. Hence this appeal.

The clauses of the will pertinent to a determination of the question before us read as follows:

"First: I give and bequeath to my son, Orris Moore, all the land on the east side of Dixie Highway in Madison County, Ky., about one mile north of Berea and containing about Eighty-five [85] acres more or less, land to be surveyed and valued at $150.00 per acre.

"Second: To my son, Jesse L. Moore, all the land on the west side of Dixie Highway; this land adjoins the above described land on the east side of Dixie Highway and contains about 96 acres more or less. This land to be surveyed and Jesse is to have equal number of acres with Orris and to pay $150.00 per acre for all over the number of acres given to Orris. The excess to go to my estate.

"Third: To my daughter, Lizzie Moore Parks, to have the Wyatt Farm about one mile west of Berea, Kentucky, containing 158¾ acres.

"Fourth: To my son, George W. Moore, to have my house and lot in the town of Berea, Kentucky, valued at $8000.00 and he to have enough cash together with the house and lot to equal the lands of Orris and Jesse in value.

"Fifth: In the event that I should die first, my wife, Lee Ann Moore, is to have one third of the proceeds derived from all the farm lands described above and it is my desire that my sons Jesse and Orris continue to farm all the farm lands and they to have two-thirds of the proceeds therefrom. My wife to have, own, and control all my property so long as she shall live and at her death the property to be distributed as set out in this will.

"Sixth: Furthermore, after all my debts, doctor bills, funeral expenses, and etc. have been paid, the remainder of my estate to be divided equally among my four children, Orris, Jesse, Lizzie and George."

The appellants alleged in their pleadings below, and argue here, that the will was obtained by fraud, duress, and undue influence on the part of the three sons and their mother, Lee Anne Moore, and also allege mental incapacity of the testator. The only question before us to be determined is whether there was sufficient proof to take the case to the jury.

It is the contention of the appellants that the disposition of the testator's estate by his will was grossly unequal and inadequate in value, in that the property willed to appellant was of much less value than that devised to each of her brothers, and that her brothers and mother exercised undue influence and fraud in the procurement of the will; that the testator was 77 years old at the time he executed the will, in feeble health, and weak in mind and body, and allege incapacity on his part to make a rational disposition of his property.

It appears that the testator had moved from his farm in Madison county to Berea about 20 years previous to his death, and during that time he rented his various farms to his sons and they cultivated and managed the farms and accounted to him, testator, for one-third of the proceeds and profits and retained two-thirds. Appellant had been married about 20 years and

she and her husband lived on a farm owned by her husband some distance from Berea.

W. F. Kidd, a resident of Berea, testified that one of the sons, George Moore, came to his home and told him that his father wanted him to come to his home and write his will. In response to this call, Kidd went to the testator's home and found him sitting up in the room; the testator told Kidd that he wanted him to write his will and he, Kidd, wrote the will with pencil as directed by the testator. He then suggested to the testator that he have the will typewritten, to which testator acceded, and Kidd took the will to the office of A. F. Scruggs, and Mr. Scruggs or his stenographer transcribed it on the typewriter, and he asked Scruggs to go to the home of the testator with him to witness the will, and on his return to testator's home he read the will to the testator as typewritten and asked him if that was what he wanted, and he responded that it was. The testator then signed the will, which was also witnessed by Kidd and Scruggs in the usual form and method required by law. Mr. Kidd was asked on cross-examination if the testator made any statement there to him about dividing his property equally among all of his children. He answered:

> "I don't know that he made just that statement, he went ahead and made a statement. Q. What was that statement? A. The statement was that he wanted each of the children to have the property set out in the will."

He stated that the testator fixed the value of the property as stated in the will and dictated or suggested the terms of the will himself.

A. F. Scruggs' testimony is substantially the same as that of Mr. Kidd from the time Mr. Kidd came to his office until the will was signed and executed by the testator. It is shown by these witnesses that there was no one in the room with the testator at the time the will was executed except that Mrs. Moore (wife of testator) came to the door and spoke to them.

The appellant, Lizzie Moore Parks, testified that she and her father were on good terms and that he was kind and affectionate to her and she visited him frequently, and on these visits he usually asked her if she saw the boys, and that his conversation seemed to be chiefly con-

cerning the boys. She stated that her father was sick for several years previous to his death, and when she visited him on some occasions he was in the bed and at other times he was up, and on one day he would be in bed and the next day he would be up and out about the farm. She further said that when she visited her father her brothers or their wives usually appeared, and she indicated that they did not want her to be there alone with her father. She stated that she visited her father on Sunday before he died on the following Wednesday, and on that occasion he said he wanted what he had to be divided equally among his four children, but said nothing about having made a will, and the first she knew about the will was on Sunday after his death, at which time she was at her brother Jesse's home and Jesse showed her a copy of the will and she read it and handed it back to him and said, "Jesse, that is not pa's will. That is you boys' will," and he responded, "That is just what we aimed for you to have." Later, she talked to her brother George about the will and told him that she was not satisfied with it, and he said, "Lizzie, it is not right." She told him that she was going to bring suit, and he asked her to wait until he could see the boys and his mother and try to make some arrangements if she would not bring suit.

It is shown that the property devised to each of the sons is of considerably more value than that devised to the appellant.

It will be seen from the above resume of the evidence that no overt act of undue influence was shown. The evidence shows nothing more than that the testator had been for many years more closely associated with the sons than with his daughter. After he moved from his farm to Berea he rented his lands and property to his sons, charging them rent therefor. But this was not unusual, and does not amount to proof of undue influence. It is the well-established rule that a mere opportunity to exercise undue influence is not in itself proof that undue influence was exercised. Stutiville's Ex'r v. Wheeler, 187 Ky. 361, 219 S. W. 411; Clore v. Argue, 213 Ky. 664, 281 S. W. 1005. And it is the equally well-known rule that mere inequality in value of property devised is not in itself evidence of undue influence or mental incapacity. While appellant alleges mental incapacity in her pleadings, yet, no witness was asked anything about the testator's mental condition at

the time he executed the will or any time. True, it is, that the testator was old and somewhat feeble, and such facts are taken into consideration as corroborative evidence of undue influence where there is other probative evidence of undue influence, but undue influence will not be presumed from age alone.

In Bodine v. Bodine, 241 Ky. 706, 44 S. W. (2d) 840, 843, wherein the facts relied on to establish alleged undue influence are equally as strong or stronger than the facts produced in the present case, the court said:

"'Undue influence,' to authorize the setting aside of a will, must be such influence as obtains dominion over the mind of the testator to the extent that destroys every chance of the exercise of his own will on his part in the disposal of his estate, and which constrains him, in respect thereto, to do that which he would not have done if left to the free exercise of his own judgment, and it is not material when this undue influence was exerted, if it was present and operated on the mind of the testator at the time of his execution of the paper."

See, also, Smith v. Smith, 243 Ky. 240, 47 S. W. (2d) 1036.

It is insisted for appellant that George Moore was active in procuring the will of the testator, and he and his brothers received a greater portion of the estate than that devised to appellant, and insists that this case comes within the rule enunciated in the case of Hoeb v. Maschinot, 140 Ky. 330, 131 S. W. 33, and Douglas' Ex'r v. Douglas, 235 Ky. 121, 29 S. W. (2d) 637. But we do not think there is any evidence in the present case conducing to show an active participation on the part of George Moore or the other sons in the preparation of the will. All the record shows on this point is that George Moore called at the home of Mr. Kidd and told him that his father wanted him to come to his home and write his will. George or no one of the other sons were present at the time the will was prepared, and the undisputed evidence of Kidd and Scruggs is that the testator dictated the will, which was read to him, and he said that it was what he wanted. The mere fact that George conveyed the message to Kidd that his father wanted him to write his will is not such active participation in procuring the will or the preparation of it as

to bring this case within the rule contended for by appellants.

An examination of the evidence disclosed by this record, measured to the authorities herein cited, impels us to the conclusion that there was no evidence of undue influence or fraud on the part of any one concerned, or that the testator was mentally incapable of making a will.

From what has been said, it follows that the trial court did not err in directing a verdict for the proponents of the will.

The judgment is affirmed.