**Richard CARBERRY, Appellant**

v.

**GOLDEN HAWK TRANSPORTATION**

---

**557**

CO., Appellee.[1]

No. 2011–CA–000269–MR.

Court of Appeals of Kentucky.

June 21, 2013.

1. Out of an abundance of caution, Carberry named Knights Inn as an appellee in the notice of appeal. By order dated November 16, 2011, we granted Knights Inn's motion to be dismissed as a party.

Justin L. Lawrence, Florence, KY, for appellant.

Judd R. Uhl, Katherine L. Kennedy, Ft. Wright, KY, for appellee.

Before LAMBERT, NICKELL, and TAYLOR, Judges.

## OPINION

NICKELL, Judge:

Richard Carberry appeals from an order granting summary judgment to Golden Hawk Transportation Company by the Boone Circuit Court. Having reviewed the record, the briefs and the law, we affirm.

This case results from an assault on Carberry by Brian Scott Ivey,[2] who was employed by Golden Hawk as a long-haul trucker. On October 25, 2008, while carrying a load of steel in Golden Hawk's truck from Arkansas to Ohio,[3] Ivey made a detour to the Knights Inn in Florence, Kentucky, with his girlfriend, Angela Sexton, as a passenger. The purpose of the trip was to allow Sexton to meet Carberry, her ex-husband, to retrieve some of her belongings. When the trio met on the motel parking lot, Ivey and Carberry began arguing about Sexton. Ivey returned to the

---

2. Ivey was not named as a defendant in this civil action. However, he was prosecuted criminally for the assault and according to pleadings, entered a guilty plea. There appears to be disagreement about the spelling of Ivey's last name. He signs his name "Ivy," but the bulk of the references to him in the record, including the complaint, are to "Ivey" and that is the spelling we will use.

3. Carberry alleges Ivey picked up a load of steel bars in Ft. Smith, Arkansas, on October 23, 2008, and delivered them to a destination in Shelby, Ohio, on October 27, 2008. According to the Driver's Daily Log signed by Ivey, Golden Hawk's truck was parked in Crestline, Ohio, from 6:30 a.m. on October 25, 2008, until October 27, 2008.

truck, retrieved a cheater bar,[4] and attacked Carberry, striking him about the head with the implement. Witnesses observed the attack.

On August 27, 2009, Carberry filed a complaint against both Knights Inn and Golden Hawk alleging he suffered a broken neck and other injuries during the assault and incurred $150,000.00 in medical and other expenses. He alleged Golden Hawk had been negligent in hiring, retaining, training and supervising Ivey, as well as monitoring movement of the rig it had assigned to Ivey. Carberry alleged Knights Inn provided inadequate security for the parking lot on which the assault occurred.

Golden Hawk and Knights Inn filed separate answers. Based on the Driver's Daily Log completed by Ivey, Golden Hawk argued the rig assigned to him was parked in Crestline, Ohio, at the time of the assault and Ivey was off-duty. After only modest discovery,[5] Golden Hawk moved for summary judgment on February 5, 2010, arguing it could not be held liable for an intentional tort committed by an employee; the attack occurred outside the scope of Ivey's work; Carberry had not alleged the attack occurred within the scope of Ivey's work; and Ivey was terminated from employment due to the assault. Accompanying the summary judgment motion was the affidavit of Laina VanBuskirk, Golden Hawk's Safety Director and Human Resource Manager. In her affidavit, VanBuskirk stated in pertinent part:

4. Upon hiring Mr. Ivey in April 2008, all checks required by law were performed on Mr. Ivey's previous employment and his driving record,[6] and no propensity toward violence was indicated.

5. Pursuant to company policy, a truck driver who leaves his truck on business not associated with the delivery of goods on behalf of the company is off the clock and outside the scope of his/her employment.

6. On the date of the alleged incident on October 25, 2008, Mr. Ivey had no business purpose for being present at a Knight's (sic) Inn in Florence, Kentucky.

4. A length of pipe and wrench used to free screws, bolts and other difficult to remove fasteners.

5. Carberry argues discovery was delayed due to the criminal prosecution of Ivey for assault.

6. A check of Ivey's driving history by Golden Hawk showed his commercial drivers' license (CDL) had been suspended in Indiana. Pursuant to company policy, the suspension resulted in a mandatory termination. A note signed by Ivey and filed in the court record reads: "The License Suspension was due to a(sic) unpaid equipment violation ticket made in my name[.] I paid the ticket to reinstate my license."

According to Carberry, when Ivey re-applied for employment with Golden Hawk in 2008, he submitted an incomplete application and Golden Hawk failed to question the missing answers. The job application Ivey certified as true and signed on April 14, 2008, indicated his CDL was issued by the state of Ohio and expires in May 2010, and he had 24 years experience driving a "TR/TR Flat." In response to questions about his involvement in any motor vehicle accidents in the last three years; all violations (other than parking) received in the last three years for which he was convicted or forfeited bond or collateral; and details of any denial, revocation, or suspension of any motor vehicle license, permit or privilege, he wrote "N/A." He identified Golden Hawk as his most recent and only employer and indicated he left the company in October 2003 due to "License Suspension." Carberry maintains that had Golden Hawk properly investigated Ivey before hiring him, it would have discovered Ivey had worked for two employers during his time away from Golden Hawk; had been convicted of violent misdemeanors; and had been cited for traffic violations.

7. After the alleged incident on October 25, 2008, and because of the alleged incident described in [Carberry's] Complaint, Mr. Ivey's employment with Golden Hawk Transportation Cabinet, has been terminated.

On April 30, 2010, the trial court entered an order awarding summary judgment to Golden Hawk and dismissing all claims against it. Specifically, the trial court found a negligent hiring and retention claim required proof that:

(1) the employer knew or reasonably should have known that an employee was unfit for the job for which he was employed, and (2) the employee's placement or retention at that job created an unreasonable risk of harm to the plaintiff.

*Ten Broeck Dupont, Inc. v. Brooks,* 283 S.W.3d 705, 733 (Ky.2009) (citing *Oakley v. Flor–Shin, Inc.,* 964 S.W.2d 438, 442 (Ky. App.1998)). The trial court concluded Carberry could not prove Golden Hawk knew or should have known Ivey was unfit to be a long-haul trucker because VanBuskirk's affidavit stated Ivey's background had been checked and "no propensity toward violence was indicated."

The court went on to say, even if additional discovery revealed Ivey had been violent, Carberry could not prove Ivey's continued employment by Golden Hawk placed Carberry at an unreasonable risk of harm. Citing *Flor–Shin,* the trial court recognized a trend in holding employers liable for torts committed by employees that have been placed in supervisory positions or have been given special access to certain locations—neither of which described Ivey's job as a long-haul trucker. Here, the trial court said Ivey met Carber-ry as an ordinary citizen, and even though Golden Hawk may have provided Ivey a truck and a tool to repair it, giving a truck driver a vehicle and tools did not, in and of itself, create an unreasonable risk of harm to the public. Comparing the case *sub judice* to *Stalbosky v. Belew,* 205 F.3d 890 (6th Cir.2000), the trial court concluded, "Golden Hawk could not have foreseen that Ivey would assault someone and that his continued retention did not put him in a special position to inflict harm."

In rejecting the claims of negligent training and supervision, the trial court cited *Booker v. GTE.net LLC,* 350 F.3d 515, 517 (6th Cir.2003), and again relied upon VanBuskirk's affidavit to find:

Golden Hawk had no reason to know that [Ivey] would assault anyone. Furthermore, as a matter of law, the Court finds that Golden Hawk did not have a duty to supervise or train [Ivey] in the manner which is suggested in the Complaint.[7] As noted above, [Ivey] happened upon [Carberry] as an ordinary citizen and acted so outside the normal scope of employment that no reasonable amount of training or supervision could have prevented the attack.

On May 3, 2010, five days *after* the order awarding summary judgment to Golden Hawk had been entered, Carberry took VanBuskirk's deposition which revealed she had not requested Ivey's criminal history, nor had she contacted all of Ivey's prior employers because he self-reported a five-year gap in employment. Based on this information, on May 10, 2010, Carberry moved the court to alter, amend or vacate the award of summary judgment to Golden Hawk or, alternative-

---

7. Carberry alleged Golden Hawk was negligent in: providing Ivey a tractor trailer that he drove onto the Knights Inn parking lot; not properly training Ivey on the dangers of using a cheater bar to assault someone; and, not tracking Ivey's vehicle to keep him from visiting the Knights Inn. (Footnote added).

ly, declare it final and appealable to allow Carberry to file an appeal to this Court. In his motion, Carberry alleged an on-line search had revealed Ivey had been charged with disorderly conduct and menacing in Ohio and his CDL had been suspended in Indiana. Carberry suggested Golden Hawk had to perform a criminal background check on Ivey to comply with Federal Motor Carrier Regulation 49 CFR (Code of Federal Regulations) § 391.25 [8] and complete an extensive ten-year employment history check to satisfy 49 CFR § 391.21.

Golden Hawk opposed any change to the award of summary judgment, arguing none of the grounds listed in CR [9] 59.05 applied. Golden Hawk further alleged Carberry had not shown Ivey to be anything but "a nice, professional employee at work" nor that he had previously been convicted of assault and battery.

In a supplemental memorandum seeking additional time to conduct discovery, filed on June 8, 2010, Carberry alleged Ivey had been:

convicted of misdemeanor battery of a child under 18 and of a separate battery in Allen County, Indiana[,] between April 17, 2006[,] and March 6, 2007. Further, Mr. [Ivey] was convicted of disorderly conduct and menacing in Ohio in 1997. Finally, the Plaintiff has discovered that Mr. [Ivey] had been employed with at least two other trucking companies during the time period in which he had claimed no employment to Golden Hawk Trucking. The Plaintiff has not yet been able to contact these companies to discover whether Brian [Ivey's] conduct there should have put Golden Hawk on notice that he was no longer fit for employment as a truck driver with Golden Hawk.

Carberry followed the filing of his supplemental memorandum with the filing of a reply memorandum in support of his motion to alter, amend or vacate on June 11, 2010, in which he argued the grant of

---

**8.** This regulation, titled "Annual Inquiry and Review of Driving Record," reads:

(a) Except as provided in subpart G of this part, each motor carrier shall, at least once every 12 months, make an inquiry to obtain the motor vehicle record of each driver it employs, covering at least the preceding 12 months, to the appropriate agency of every State in which the driver held a commercial motor vehicle operator's license or permit during the time period.

(b) Except as provided in subpart G of this part, each motor carrier shall, at least once every 12 months, review the motor vehicle record of each driver it employs to determine whether that driver meets minimum requirements for safe driving or is disqualified to drive a commercial motor vehicle pursuant to § 391.15.

(1) The motor carrier must consider any evidence that the driver has violated any applicable Federal Motor Carrier Safety Regulations in this subchapter or Hazardous Materials Regulations (49 CFR chapter I, subchapter C).

(2) The motor carrier must consider the driver's accident record and any evidence that the driver has violated laws governing the operation of motor vehicles, and must give great weight to violations, such as speeding, reckless driving, and operating while under the influence of alcohol or drugs, that indicate that the driver has exhibited a disregard for the safety of the public.

(c) Recordkeeping.

(1) A copy of the motor vehicle record required by paragraph (a) of this section shall be maintained in the driver's qualification file.

(2) A note, including the name of the person who performed the review of the driving record required by paragraph (b) of this section and the date of such review, shall be maintained in the driver's qualification file.

**9.** Kentucky Rules of Civil Procedure.

summary judgment should be vacated due to (1) manifest error, because the trial court relied heavily on VanBuskirk's affidavit; (2) he had just discovered new evidence about Ivey's violent past; and (3) it would be a manifest injustice to allow the summary judgment to stand because the assault had rendered Carberry destitute. Golden Hawk responded to Carberry's supplemental memorandum arguing that even if Ivey were found to have a criminal history, it was still unreasonable to conclude that but for Golden Hawk's hiring Ivey, Carberry would not have been assaulted, especially since the altercation was unrelated to Ivey's job as a long-haul trucker.

On June 25, 2010, the trial court denied Carberry's motion to alter, amend or vacate the grant of summary judgment. Following additional motions, the trial court entered an amended order containing finality language on January 28, 2011. This appeal followed.

## ANALYSIS

Carberry complains that summary judgment was erroneously granted to Golden Hawk despite the existence of genuine issues of material fact and the incomplete discovery. We disagree and affirm.

The standard of review on appeal when a trial court grants a motion for summary judgment is "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." The trial court must view the evidence in the light most favorable to the nonmoving party, and summary judgment should be granted only if it appears impossible that the nonmoving party will be able to produce evidence at trial warranting a judgment in his favor. The moving party bears the initial burden of showing that no genuine issue of material fact exists, and then the burden shifts to the party opposing summary judgment to present "at least some affirmative evidence showing that there is a genuine issue of material fact for trial." The trial court "must examine the evidence, not to decide any issue of fact, but to discover if a real issue exists." While the Court in *Steelvest* [*, Inc. v. Scansteel Service Center, Inc.,* 807 S.W.2d 476, 482 (Ky.1991)] used the word "impossible" in describing the strict standard for summary judgment, the Supreme Court later stated that that word was "used in a practical sense, not in an absolute sense." Because summary judgment involves only legal questions and the existence of any disputed material issues of fact, an appellate court need not defer to the trial court's decision and will review the issue *de novo.*

*Lewis v. B & R Corporation,* 56 S.W.3d 432, 436 (Ky.App.2001) (internal citations omitted).

The parties agree that *Flor–Shin* identifies the two elements necessary to prove a claim of negligent hiring and retention—an unfit applicant for a particular job and creation of an unreasonable risk of harm by the hiring of that applicant. Carberry disagrees with the trial court's application of the *Flor–Shin* test.

In *Flor–Shin,* an award of summary judgment to a floor maintenance company was vacated because it had hired and placed William Bayes, a man with an extensive criminal record,[10] inside a locked

---

10. Bayes had been convicted of burglary, theft and bail jumping. He had also been arrested for criminal attempt to commit rape in the first degree and carrying a concealed deadly weapon. Flor–Shin was aware of Bayes's criminal past, or would have been,

K–Mart store with a single female employee whom he sexually assaulted. Here, we agree with the trial court's application of *Flor–Shin* and its award of summary judgment. Ivey was hired as a truck driver. A check of his driving history, as required by 49 CFR § 391.25, revealed a few driving violations over a lengthy career but not enough to make him unfit to handle a big rig. Unlike Bayes in *Flor–Shin*, Ivey's job with Golden Hawk did not place him alone in an enclosed space with the public and definitely not with Carberry. The attack occurred in the open and in public view.

Carberry makes much of the fact that Golden Hawk did not perform a criminal background check on Ivey—a fact VanBuskirk readily admitted during her deposition. We have read the federal regulations cited by Carberry and nowhere do we find a requirement that a motor carrier check the criminal history of a job applicant. The standard federal job application for truck drivers references 49 C.F.R. § 391.21. That regulation is geared toward collecting data on an applicant's address; motor vehicle experience; involvement in motor vehicle accidents in the last three years; violations (other than parking) that resulted in conviction or forfeiture of bond or collateral in the last three years; and the details of any denial, revocation, or suspension of any motor vehicle license, permit or privilege. Neither the application, nor the regulation on which it is based, requests one's criminal history. Thus, Carberry's argument that Golden Hawk was negligent in not investigating Ivey's criminal history is unfounded.

Carberry also argues Golden Hawk failed to delve deeply enough into Ivey's

prior employment. 49 C.F.R. § 391.21(a) specifies:

> a person shall not drive a commercial motor vehicle unless he/she has completed and furnished the motor carrier that employs him/her with an application for employment that meets the requirements of paragraph (b) of this section.

Ivey completed such a form. Because Ivey was operating a commercial motor vehicle [11] he was required to list all of his employers for the past decade. 49 CFR § 391.21(11).

Carberry alleges Ivey worked for at least two employers that he did not list on the application. While we must accept Carberry's allegation as true under *Steelvest*, we also recognize that a potential employer must have a modicum of faith and trust in a job applicant. Ivey certified his answers were truthful by signing the application, and Carberry has identified no red flags that should have caused Golden Hawk to question what otherwise appeared to be a complete application. We are unwilling to fault Golden Hawk for Ivey's deceit.

■ Golden Hawk's assignment of Ivey to haul a load of steel from Arkansas to Ohio did not place him on a collision course with Carberry—nor did it create an unreasonable risk of harm to Carberry. It appears Carberry and Sexton, his ex-wife, planned to meet at the Knights Inn parking lot in Florence, Kentucky, to exchange belongings. Ivey, Sexton's current boyfriend, happened to bring Sexton to the parking lot in a Golden Hawk truck, without Golden Hawk's knowledge or approval.

had it conducted the criminal background check it told K–Mart it would perform. The appellate court believed Flor–Shin was aware of Bayes's criminal history because he was hired for the company by his brother-in-law. *Flor–Shin*, 964 S.W.2d at 442.

11. Defined in 49 CFR § 383.5 as a vehicle of a certain weight or one designed to carry 16 passengers and a driver, or used to haul hazardous materials.

Based on these circumstances, we cannot say Golden Hawk failed to use ordinary care in hiring or retaining Ivey nor that hiring or retaining Ivey created an unreasonable risk of harm to Carberry. Golden Hawk could not have foreseen that Ivey would take such action.

Golden Hawk did not send Ivey to the Knights Inn parking lot—Ivey chose to take a detour and go there on his own. Golden Hawk did nothing to give Ivey special access to Carberry or to place the two men within close proximity of one another. Thus, even if Carberry could establish Golden Hawk should have done a broader investigation of Ivey's background, he still could not identify any action by Golden Hawk that created an unreasonable risk to Carberry. Having a strict policy prohibiting passengers would not have ensured Ivey's compliance with the rule—according to VanBuskirk's deposition, Ivey signed a document showing he was aware that passengers were disallowed. Furthermore, Carberry does not allege that any of Ivey's violent outbursts were related to driving such that hiring him as a trucker placed the motoring public at risk.

On the allegation of negligent training and supervision, an employer may be held liable for the negligent supervision of its employees "only if he or she knew or had reason to know of the risk that the employment created." *Booker,* 350 F.3d at 517 (quoting Restatement (Second) of Agency § 213 (1958) (Comment & Illustrations)); *see also Smith v. Isaacs,* 777 S.W.2d 912, 914 (Ky.1989). On the strength of VanBuskirk's affidavit, the trial court found Golden Hawk had no reason to suspect Ivey would commit an assault while on the job and went on to find Ivey "acted so outside the normal scope of employment that no reasonable amount of training or supervision could have prevented the attack."

On the facts presented, we agree. The meeting between Sexton, Carberry and Ivey occurred unbeknownst to Golden Hawk and was not in furtherance of Golden Hawk's business interests. We see no basis upon which Carberry could succeed on a claim of negligent training and supervision.

Summary judgment "is proper only after the party opposing the motion has been given ample opportunity to complete discovery and then fails to offer controverting evidence." *Suter v. Mazyck,* 226 S.W.3d 837, 841 (Ky.App.2007). "Absent a sufficient opportunity to develop the facts ... summary judgment cannot be used as a tool to terminate the litigation." *Id.* at 842. There is no requirement that discovery be completed, only that the non-moving party have "had an opportunity to do so." *Hartford Insurance Group v. Citizens Fidelity Bank & Trust Company,* 579 S.W.2d 628, 630 (Ky.App.1979).

Carberry was in the midst of taking depositions when the order awarding summary judgment to Golden Hawk was entered. Carberry had been unable to depose Ivey due to the criminal prosecution. Carberry claims he needed more time to depose eyewitnesses; investigating officers; and Ivey, his coworkers and former employers. However, the fact of the assault is no longer disputed and no amount of discovery would change the fact that Ivey did not assault Carberry in the course and scope of his job as a long-haul trucker for Golden Hawk. Thus, the mere fact that Ivey and Sexton arrived at the Knights Inn parking lot in a Golden Hawk truck was insufficient to make Golden Hawk liable for the assault committed by Ivey and Carberry's resulting medical bills. Therefore, we cannot conclude summary judgment was entered prematurely.

In *Wood v. Southeastern Greyhound Lines,* 302 Ky. 110, 194 S.W.2d 81 (1946), a commercial bus driver stopped his vehicle, alighted and assaulted another motorist. Wood's attempt to recover damages for the assault from the bus line was thwarted because:

> the master is liable only for the acts of his servant committed in the course or scope of the latter's employment and not for the acts of the servant committed by him while not serving the master and outside of the scope of his employment. *Hines v. Walls,* 194 Ky. 379, 239 S.W. 451 [ (1922) ].

*Wood,* 302 Ky. at 113, 194 S.W.2d at 82. Just as the bus driver in *Wood* did not assault the other driver in furtherance of the bus company's interests, Ivey did not assault Carberry in furtherance of Golden Hawk's interests. Therefore, the trial court's order awarding summary judgment to Golden Hawk is affirmed.

ALL CONCUR.