RENDERED: FEBRUARY 3, 2023; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2021-CA-1027-MR

THOMAS JOHN ALGEO                                                   APPELLANT

v.
APPEAL FROM WARREN CIRCUIT COURT
HONORABLE STEVE ALAN WILSON, JUDGE
ACTION NO. 20-CI-00447

THE ESTATE OF JOHN THOMAS ALGEO,
BY AND THROUGH ITS EXECUTRIX,
CATHERINE MARIE ALGEO; and
CATHERINE MARIE ALGEO,
INDIVIDUALLY                                                       APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CETRULO, EASTON, AND KAREM, JUDGES.

EASTON, JUDGE: Thomas John Algeo appeals an order of the Warren Circuit

Court granting summary judgment in a will contest he filed against the above-

referenced appellees. Upon review, we affirm.

# FACTUAL AND PROCEDURAL HISTORY

This case is a will dispute between the children of John Thomas Algeo ("John"). The appellant, Thomas John Algeo ("Thomas"), is the brother of the appellee Catherine Marie Algeo ("Catherine") who serves as the executrix of their father's estate. The specific will at issue was executed in April of 2012. In this will, John gave his entire estate, less taxes and costs, to Catherine. The will's exact wording regarding the disinheritance of Thomas is as follows:

> After thoughtful consideration, I have elected not to include my dear son, Thomas John Algeo, as a residuary beneficiary of this estate. This decision in no way reflects a lack of love, pride, and true friendship with my son. It however reflects my belief that my son, Thomas John Algeo, has been financially successful in life and has sufficient financial resources and family support to provide for his needs. My daughter, Catherine Marie Algeo, does not have the same source of financial and family support and is, in my belief, in greater need. I do leave to my two children, in equal shares, both my love and admiration.

John previously executed a will in 2010 which split his estate equally between his two children. John eventually passed away on October 13, 2019, at the age of 88. Afterward, Catherine offered the 2012 will for probate, and the Warren District Court admitted it for that purpose. In March of 2020, Thomas filed suit in Warren Circuit Court contesting the 2012 will, claiming it was the product of Catherine's undue influence. Thomas made some initial suggestion about John's incapacity separate from undue influence. Thomas abandoned that

-2-

claim and for good reason. Overwhelming evidence submitted in this record

removes any genuine question of capacity in 2012.

After written discovery, Catherine moved for summary judgment,

arguing no evidence supported Thomas' claims. After an oral argument on August

2, 2021, the circuit court granted Catherine's motion on August 11, 2021. This

appeal followed. Additional facts will be discussed, as necessary, in the context of

our analysis below.

## STANDARD OF REVIEW

As discussed, all of Thomas' allegations of error emanate from the

summary dismissal of his claims. In weighing the foregoing allegations of error:

> "[t]he standard of review on appeal of a summary
> judgment is whether the circuit judge correctly found that
> there were no issues as to any material fact and that the
> moving party was entitled to a judgment as a matter of
> law." *Pearson ex rel. Trent v. Nat'l Feeding Systems,
> Inc.*, 90 S.W.3d 46, 49 (Ky. 2002). Summary judgment
> is only proper when "it would be impossible for the
> respondent to produce any evidence at the trial
> warranting a judgment in his favor." *Steelvest, Inc. v.
> Scansteel Service Center, Inc.*, 807 S.W.2d 476, 480 (Ky.
> 1991). In *Steelvest*, the word "'impossible' is used in a
> practical sense, not in an absolute sense." *Perkins v.
> Hausladen*, 828 S.W.2d 652, 654 (Ky. 1992). In ruling
> on a motion for summary judgment, the court is required
> to construe the record "in a light most favorable to the
> party opposing the motion . . . and all doubts are to be
> resolved in his favor." *Steelvest*, 807 S.W.2d at 480. A
> party opposing a summary judgment motion cannot rely
> on the hope that the trier of fact will disbelieve the
> movant's denial of a disputed fact, but must present

> affirmative evidence in order to defeat a properly
> supported motion for summary judgment. *Id*. at 481.

*Ryan v. Fast Lane, Inc.*, 360 S.W.3d 787, 789-90 (Ky. App. 2012).

> "Appellate review of a summary judgment
> involves only legal questions and a determination of
> whether a disputed material issue of fact exists. So, we
> operate under a de novo standard of review . . . ." *Adams
> v. Sietsema*, 533 S.W.3d 172, 177 (Ky. 2017) (quoting
> *Shelton v. Ky. Easter Seals Soc'y, Inc.*, 413 S.W.3d 901,
> 905 (Ky. 2013)).

*Phelps v. Bluegrass Hospitality Mgt., LLC*, 630 S.W.3d 623, 627 (Ky. 2021).

## ANALYSIS

On appeal, Thomas presents two overarching arguments as to why, in his view, summary judgment was improper: (1) it was premature because discovery had yet to be completed; and (2) evidence of record demonstrated genuine issues of material fact relative to the issue of undue influence.

Regarding Thomas' first argument, it is unpreserved. Contrary to what Thomas represents in his appellate brief, he did *not* argue below in his "Response to Motion for Summary Judgment" that summary judgment was premature. His response also did not contest Catherine's representation, set forth in the introduction of her motion for summary judgment, that "[t]he parties have completed written discovery[.]" Nor did Thomas move for a continuance or bring

-4-

this issue to the circuit court's attention in a CR[1] 59.05 motion. Additionally, Thomas makes no request for palpable error review.[2] Because we must review the discovery to assess the propriety of summary judgment in this case, we choose to address the opportunity to complete discovery.

We note "[t]here is no requirement that discovery be completed, only that the non-moving party have 'had an opportunity to do so.'" *Carberry v. Golden Hawk Transp. Co.*, 402 S.W.3d 556, 564 (Ky. App. 2013) (citation omitted). Six months has been deemed an adequate opportunity to complete discovery. *Hartford Ins. Group v. Citizen's Fidelity Bank & Trust Co.*, 579 S.W.2d 628 (Ky. App. 1979).

Here, almost a year had elapsed before Catherine filed her summary judgment motion: Thomas filed suit on March 25, 2020, and Catherine moved for summary judgment on March 1, 2021. An additional six months elapsed before the circuit court considered the summary judgment motion. Even if we consider the argument, Thomas clearly had the required "opportunity" to present some evidence through discovery of a genuinely disputed fact.

---

[1] Kentucky Rule of Civil Procedure.

[2] Absent extreme circumstances amounting to a substantial miscarriage of justice, an appellate court will not engage in palpable error review "unless such a request is made and briefed by the appellant." *Jenkins v. Commonwealth*, 607 S.W.3d 601, 613 (Ky. 2020) (quoting *Shepherd v. Commonwealth*, 251 S.W.3d 309, 316 (Ky. 2008)).

Regarding his second overarching argument (*i.e.*, that evidence of record demonstrated genuine issues of material fact relative to the issue of undue influence), we begin our analysis with a review of the operative law. To invalidate a will based upon undue influence, it must be demonstrated that undue influence was at "a level of persuasion which destroys the testator's free will and replaces it with the desires of the influencer." *Bye v. Mattingly*, 975 S.W.2d 451, 457 (Ky. 1998) (citations omitted). The Kentucky Supreme Court recently set forth the legal framework to determine when a will is to be invalidated based upon undue influence:

> In discerning whether influence on a given testator is "undue," courts must examine both the nature and the extent of the influence. First, the influence must be of a type which is inappropriate. Influence from acts of kindness, appeals to feeling, or arguments addressed to the understanding of the testator are permissible. Influence from threats, coercion and the like are improper and not permitted by the law. Second, the influence must be of a level that vitiates the testator's own free will so that the testator is disposing of her property in a manner that she would otherwise refuse to do. The essence of this inquiry is whether the testator is exercising her own judgment.

> In addition to demonstrating that undue influence was exercised upon the testator, a contestant must also show influence prior to or during the execution of the will. Undue influence exercised after the execution of the will has no bearing whatsoever upon whether the testator disposed of her property according to her own wishes.

The influence must operate upon the testator at the execution of the will. If the influence did not affect the testator, then such conduct is irrelevant. However, even if the influence occurred many years prior to the execution of the will, but operates upon the testator at the time of execution, it is improper and will render the will null and void.

To determine whether a will reflects the wishes of the testator, the court must examine the indicia or badges of undue influence. Such badges include a physically weak and mentally impaired testator, a will which is unnatural in its provisions, a recently developed and comparatively short period of close relationship between the testator and principal beneficiary, participation by the principal beneficiary in the preparation of the will, possession of the will by the principal beneficiary after it was reduced to writing, efforts by the principal beneficiary to restrict contacts between the testator and the natural objects of his bounty, and absolute control of testator's business affairs.

. . . .

When a contestant seeks to claim that undue influence was employed upon a testator, the burden is upon the contestant to demonstrate the existence and effect of the influence. Merely demonstrating that the opportunity to exert such influence [existed] is not sufficient to sustain the burden of proof. When undue influence and a mentally impaired testator are both alleged and the mental impairment of the testator is proven, the level of undue influence which must be shown is less than would normally be required since the testator is in a weakened state.

*Getty v. Getty*, 581 S.W.3d 548, 555-56 (Ky. 2019) (quoting *Bye*, 975 S.W.2d at 457).

-7-

Before discussing what this record discloses regarding "badges of undue influence," we turn to what Thomas asserts is direct proof of Catherine's undue influence upon their father, John. Citing the offending provision of John's will, Thomas argued below that "Catherine had *apparently* been telling her father that her brother was far more financially secure that [sic] she, and that she needed the estate more than her brother."

"Apparently" is emphasized because no evidence of record demonstrates Catherine told John anything about her brother's financial situation, and this is nothing more than Thomas' unsubstantiated *belief*, which "is not evidence and does not create an issue of material fact." *Sparks v. Trustguard Ins. Co.*, 389 S.W.3d 121, 124 (Ky. App. 2012) (citations omitted). Suppositions are not evidence. More to the point, the circuit court correctly observed in its dispositive order that Thomas adduced no evidence that contradicted John's belief, as set forth in the 2012 will, that:

> Thomas John Algeo, has been financially successful in life and has sufficient financial resources and family support to provide for his needs. My daughter, Catherine Marie Algeo, does not have the same source of financial and family support and is, in my belief, in greater need.

To the extent Thomas took any issue with John's above-stated "belief" at the trial court level, his evidence only took issue with where he thought

-8-

it *came* from.  In the affidavit he submitted in support of his summary judgment response, all that Thomas stated about his father's belief was the following:

> 4.  In the will that has now been admitted to probate, which I am contesting, my father observes that, after "thoughtful consideration" I am not to be included as a beneficiary of his estate.  He explains his reasoning by stating that I have been "financially successful in life" and that his daughter (my sister) "does not have the same source of financial and family support" and is in "greater need."

> The fact of the matter is that John Algeo, the decedent, absolutely could not have considered the relative financial positions of his son and daughter, because he had absolutely no financial information whatsoever regarding his son's condition.  Therefore, the only information that he would have had in this regard would be information that Catherine had given to him in order to influence the making of his will.

Undue influence in the area of wills is a species of fraud.  *Marcum v. Gallup*, 237 S.W.2d 862, 865 (Ky. 1951).  Fraud is not to be presumed and must be established by clear and convincing evidence.  *See United Parcel Service Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999).  Here, nothing of record demonstrates Catherine made any representation to John about Thomas' financial need; accordingly, it would be pure speculation to conclude that John's belief about Thomas' financial need was born of any *influence* from Catherine.  Furthermore, nothing of record demonstrates John's "belief" about Thomas' financial need, as set forth in the 2012 will, was incorrect or misinformed at that time.  Accordingly,

-9-

even if Catherine did make some representation to John that influenced his opinion about Thomas' financial need, it would also be pure speculation to conclude that John's resulting belief about Thomas' financial need was born of undue influence from Catherine, as opposed to non-actionable influence consisting of "modest persuasion and arguments addressed to the understanding, or by mere appeals to the affections[.]" *Cecil's Ex'rs v. Anhier*, 176 Ky. 198, 195 S.W. 837 (1917).

As an aside, Thomas also argues on appeal that John's "belief" about his financial need, as set forth in the 2012 will, *was* incorrect and misinformed. Whether Thomas effectively preserved this argument is questionable because his counsel only stated in passing and without further elaboration during the August 2, 2021, summary judgment hearing that John's belief about his children's relative finances was "not true." In any event, arguments and representations by Thomas' counsel are not evidence. *Mason v. Commonwealth*, 331 S.W.3d 610, 624-25 (Ky. 2011). And no evidence of record otherwise supports this argument. Accordingly, we will not address this point further.

We now turn to the circumstantial evidence of undue influence, *i.e.*, the "badges." Initially, Thomas argues undue influence from Catherine is evident because the 2012 will reflects an "unnatural disposition" of John's estate. In that vein, he points out that John's 2012 will: (1) disinherited him; and (2) differed from a prior will John executed in 2010, which did not disinherit him.

-10-

The issue of whether a will is sufficiently unnatural on its face to raise an issue of fact requires examination of what is and is not unnatural in each situation. It is "perfectly normal for a person to change his mind or even to do at a later date something contrary to his earlier expressed intention." *New v. Creamer*, 275 S.W.2d 918, 920 (Ky. 1955). There are a variety of reasons why one child might be preferred over another, or a friend may be preferred over a child. "It might be said generally that to exclude one's children might be considered unnatural, but merely because one happens to be the offspring of a testator does not *entitle* one to be included in an estate. Moreover, there is nothing *requiring* a parent to make such a provision." *Wallace v. Scott*, 844 S.W.2d 439, 441 (Ky. App. 1992). Additionally, "[t]he power to disinherit may be the only means an old person has of assuring his needs." *Middleton v. Middleton's Ex'r*, 302 S.W.2d 588, 591 (Ky. 1956) (citation omitted). It is not unnatural for a testator to favor one heir over another because of the comparative financial needs of the heirs. *Race v. Stevens*, 276 S.W.2d 439, 440 (Ky. 1954).

Here, the undisputed evidence shows Catherine regularly helped take care of John after his wife (the parties' mother) passed away; and in 2010, John moved to the city where Catherine lived – Bowling Green, Kentucky – to make it easier for her to do so. Thomas, on the other hand, resided in Cincinnati, and was unable to care for John or regularly visit him because, unlike Catherine, Thomas

-11-

had a spouse and children of his own to care for. John's apparent need for a caretaker and Catherine's proximity to him simultaneously demonstrates John's vulnerability to undue coercion, but also provides a rational explanation for the unequal treatment. However, viewing the circumstance most favorably to Thomas raises merely a suspicion that the will could have been the product of undue influence.

No single badge of undue influence is conclusive. Indeed, "an unequal or unnatural disposition by itself is not enough to show undue influence[.]" *Sutton v. Combs*, 419 S.W.2d 775, 777 (Ky. 1967). Instead, their cumulative effect must be considered. And, regarding those additional "badges," there is no evidence – and Thomas makes no argument – that Catherine restricted contact between John and anyone else; or that the relationship between John and Catherine was recently developed and comparatively short. *Getty*, 581 S.W.3d at 555.

Thomas asserted that "[a]t the time of the making of the will in issue, [John] was elderly and physically weakened." John was eighty-one years old when he executed his will. John required the assistance of a walker to ambulate and no longer drove a vehicle at that time. However, old age alone does not give rise to a presumption of undue influence. *Parks v. Moore's Ex'r*, 265 Ky. 678, 97 S.W.2d 579, 581 (1936). Moreover, age and evidence of physical weakness and

-12-

enfeeblement are merely "corroborative evidence of undue influence where there is other probative evidence of undue influence[.]" *Id.* These factors are relevant insofar as they demonstrate the testator was *susceptible* to undue influence. *See Hines v. Price*, 310 Ky. 758, 221 S.W.2d 673, 676 (1949) (emphasis added) (explaining, "in determining the issue of undue influence the jury may take into consideration the testator's age and evidence of physical weakness and enfeeblement *likely to impair his mind and powers of resistance*").

Here, Thomas no longer makes any argument that John lacked testamentary capacity. It is undisputed that at all relevant times John resided by himself in an apartment at Village Manor in Bowling Green Kentucky – an independent living facility, not a nursing home – and that he was largely self-sufficient. Thomas also adduced no evidence that John's physical health affected his mental health or otherwise impaired John's powers of resistance at any relevant time before or at the time John executed the 2012 will. Thus, John's age and physical condition presented no material issue for purposes of withstanding summary judgment.

We now proceed to another badge, *i.e.*, "absolute control." *Getty*, 581 S.W.3d at 555. Again, John did not reside with Catherine. Furthermore, there has been no showing that Catherine exploited John to financially gain from him. Notwithstanding, Thomas argues "[t]he only circumstances that had changed

between January 2010 and April 2012 was that Catherine had assumed complete control over all of his [Testator's] financial, medical, and personal affairs." In support, he represents that John gave Catherine "power of attorney" "during this time"; that Catherine ignored "an existing commitment from their father to financially contribute to Thomas' three minor children's 529 education accounts"; and that one of John's medical records from May 13, 2011, recites that Catherine accompanied John to an appointment with his neurologist and "helped supply portions" of his medical history.

However, the parameters and extent of the aforementioned "power of attorney" are unknown, as it is not of record. Thomas also altered his "during this time" statement by explaining elsewhere in his brief – consistently with an interrogatory answer he provided during discovery – that John granted Catherine "power of attorney" in "April 2012." Recall, John executed his will at issue in this matter on April 25, 2012. If Thomas is insinuating that the existence of a power of attorney evinced Catherine's requisite "control" over John's affairs, he has adduced nothing indicating this control existed *before*, as opposed to *after*, John executed his will. *See Getty*, 581 S.W.3d at 555 (citation omitted) ("Undue influence exercised after the execution of the will has no bearing whatsoever upon whether the testator disposed of her property according to her own wishes.").

-14-

There is a similar problem with Thomas' contention that Catherine ignored "an existing commitment from their father to financially contribute to Thomas' three minor children's 529 education accounts."  In the interrogatory answers he provided during discovery below, Thomas acknowledged that his "three minor children" are triplets born in 2014 – two years *after* John executed his will.  As they did not yet exist when John executed his will in 2012, Catherine could not have controlled or influenced John's decision to exclude Thomas or his children from the 2012 will.

Lastly, *one* of John's medical records from May 13, 2011, does indeed recite that Catherine accompanied John to an appointment with his neurologist and "helped supply portions" of his medical history.  In and of itself, this does not demonstrate Catherine controlled John, much less exercised the requisite "absolute control" over him.  *Getty*, 581 S.W.3d at 555.

Proceeding to another "badge," Thomas asserts Catherine participated in the preparation of John's 2012 will.  He presents no direct evidence of this; and Catherine denied doing so in an affidavit she submitted of record.  Catherine also averred that she was unaware of the terms of John's 2012 will before he executed it.  However, Thomas asserts that the following is circumstantial evidence in support of his assertion:  (1) Catherine recommended to John the attorney he selected to draft the 2012 will – the same law firm that represented Catherine

below and continues to do so in this appeal; (2) Catherine drove John to the law firm on the date he executed the will; and (3) Catherine was aware of "notes" John made regarding what he wanted in the 2012 will, and email correspondence John submitted to his attorney to that effect.

We disagree that this evidence was sufficient. Regarding his first point, Catherine also retained the attorney John had selected to draft his 2012 will (Frank Hampton Moore, Jr.); but she did so, as reflected by the answer she filed below, no later than April 13, 2020. Nothing indicates Catherine and Moore were more than strangers to one another or had any interaction prior to and when John executed the 2012 will. The only evidence of record relevant to this point is found in Catherine's summary judgment affidavit, in which she averred:

> 8. With regard to [John's] decision to draft a new will, he specifically indicated to me that he asked persons at Village Manor and he asked me with regard to a recommendation for an attorney. I indicated that I did not know anyone but would ask persons at W.K.U. and after polling some persons about any recommendations as to someone who would be suitable for drafting a will and estate documents, I was provided the name of Frank Hampton Moore, Jr. I provided Mr. Moore's name and contact information to my father and he initiated the contact with the law firm of Cole & Moore to make an appointment. My father later changed the appointment time on his own and then indicated this new date and time to me so I would be available to drive him to the office. I only drove my father to the appointment and did not participate or provide input in the drafting of the will.

-16-

Regarding Thomas' second point, a beneficiary does not actively participate in the execution of a will, for purposes of this "badge," by merely driving the testator to and from the lawyer's offices. *Bye*, 975 S.W.2d at 459.

As for Thomas' third point, it derives from inferences he makes from the following paragraph of Catherine's affidavit, in which she stated:

> 9. I recall that my father did indicate that he had made some changes to the will, and he made notes regarding what he wanted modified. He emailed those changes to Mr. Moore and they were incorporated into the Last Will and Testament.

That said, Thomas' assertion this demonstrates Catherine actively participated in the drafting and execution of John's 2012 will is speculation and conjecture, rather than reasonable inference. From the foregoing averment, it is unclear whether Catherine was personally aware of notes and emails John made relating to his 2012 will, or whether John simply indicated to Catherine that he had made notes and had emailed his attorney about it. Moreover, this averment does not specify when John indicated to Catherine – or when Catherine became aware – that John had done those things. Absent more, this is insufficient.

Next, Thomas asserts a pair of arguments founded upon an affidavit he submitted below, in which he recounted details of a visit he paid to John in "December 2017." The relevant substance of his affidavit is as follows:

> 2. In December 2017, I visited my father, John Thomas Algeo, and recorded our conversation about his Last Will

and Testament. With my father's permission I looked in his home office for his will and found the Last Will and Testament of 2010. I did not find the Last Will and Testament of 2012.

3. My father, John Thomas Algeo read through his 2010 Last Will and Testament which stated that Catherine Marie Algeo and Thomas John Algeo received equal shares of his estate. My father commented: ". . . that all seems perfectly satisfactory me [sic]. Does it seem satisfactory to you?" In this recording, my father can be clearly heard to say that his wishes are a 50/50 split of his estate.

. . . .

5. During this 2017 visit, my father did not have his 2012 will in his possession. Catherine's statement that my father always had his 2012 will in his possession is false. It is my belief that Catherine had my father's 2012 will in her possession.

6. I requested a copy of my father's 2012 Last Will and Testament, and he called Catherine Marie Algeo to request a copy. He told me: ". . . she [Catherine] doesn't want you to have a copy of my will." Thomas: "Why is that?" John: "Because she thinks that you might use it to have me declared mentally incompetent." My father went on to say that he himself did not have a copy of his 2012 will and that he thought that I should have a copy and he would "do my best to see that Katie sends you a copy of my will . . . ."

7. I tried to contact Catherine on multiple occasions, mostly via email, to request that she provide a copy of my father's will to me. My father had given me his verbal approval that Catherine provide me such a copy. Despite my multiple requests, no copy was provided to me by her. In fact, she ignored all of these requests and never responded to them.

There is no indication John gave Thomas permission to record him or that John was even made aware of this alleged recording. Most significant is the fact Thomas did not produce this recording as evidence. The recording would have been the best evidence of the interaction. The absence of this recording further damages the weak foundation of any actual evidence to support Thomas' claims of undue influence.

If we accept the reported contents of the missing recording as true, Thomas' first argument is that what is set forth above from that recording demonstrates that in "December 2017," John's stated intent was "a 50/50 split of his estate." Thomas assumes John's intent in 2017 is a material element of the dispute over whether his 2012 will was signed under undue influence, and therefore, that a declaration John made in 2017 indicating his testamentary intent was relevant.

Thomas is incorrect. John's intent in December 2017 is not a material element of a disputed fact in the case before us. Once a will has been duly admitted to probate, as it has here, it presumptively reflects the true intentions of the testator, since in such circumstances the testator is presumed competent and of sound mind. "If the rule were otherwise, a will would amount to nothing, since it could be overthrown and a new and different will established by parol testimony." *White v. Ponder*, 180 Ky. 386, 202 S.W. 867, 869 (1918). For purposes of this

case, the dispositive facts Thomas was required to prove were those that would demonstrate specific acts of undue influence from Catherine. John's intentions in December 2017 do not tend to prove or disprove any elements of undue influence in 2012.

Thomas' second argument is that what is set forth above demonstrates Catherine had exclusive possession of John's 2012 will in December 2017; and that this evidence was sufficient to demonstrate undue influence for purposes of summary judgment. We disagree. First, Catherine insists the will was in possession of John's attorney. To be sure, "possession of the will by the principal beneficiary after it was reduced to writing" is considered one of the "badges of undue influence." *Getty*, 581 S.W.3d at 555. But Thomas is describing a situation that arose five years *after* John executed the 2012 will. *See id.* (citation omitted) ("Undue influence exercised after the execution of the will has no bearing whatsoever upon whether the testator disposed of her property according to her own wishes.").

Taken as true, there is also no indication that Catherine prevented *John* from accessing his 2012 will – only *Thomas*. What is set forth above demonstrates that after John executed his 2012 will, Thomas could not find it in John's office, John believed he did not have possession of his 2012 will, and Catherine could supply a copy of it to Thomas, which she refused to do. For her

part, Catherine averred she never possessed John's 2012 will. Perhaps, if Catherine was John's power of attorney, she may have had access to John's 2012 will sufficient to enable her to make a copy of it for Thomas. But nothing demonstrates she had *exclusive possession* of John's will at any point in time.

Contrary to what Thomas represents about the substance of Catherine's affidavit, Catherine averred that John only had possession of a copy of his 2012 will, and that his original 2012 will was, to the best of her understanding, in the possession of John's attorney, Moore, who kept it on John's behalf in a safe deposit box maintained by his firm. Moore, for his part, also submitted a reply memorandum during the underlying litigation verifying that his firm had indeed kept John's original 2012 will in a safe deposit box maintained by his firm at all relevant times – a point that Thomas does not refute or address. Thomas' *belief* that Catherine had exclusive possession of John's 2012 will is not evidence that she *had* exclusive possession of John's 2012 will. *Sparks*, 389 S.W.3d at 124 (citations omitted).

## CONCLUSION

We have addressed the breadth of what Thomas presents on appeal about his claim of undue influence. The totality of the circumstances here, viewed most favorably toward his case, establishes nothing of substance illustrating a genuine issue of material fact. From the whole of this record, it is practically

impossible for Thomas to have presented clear and convincing evidence to a factfinder to establish undue influence thus warranting submission of this matter to a jury. The Warren Circuit Court did not err in granting summary judgment judgment in this case. We therefore AFFIRM.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Joseph P. Bowman
Frankfort, Kentucky

BRIEF FOR APPELLEES:

Frank Hampton Moore, Jr.
Bowling Green, Kentucky